PAUL B. SNYDER
U.S. Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

✓ FILED
_____LODGED
_____RECEIVED

**May 16, 2005**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____DEPUTY

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

CADET MANUFACTURING COMPANY,

          Debtor-in-Possession.

Case No.  99-30304

**MEMORANDUM DECISION**

**NOT FOR PUBLICATION**

     This matter came on for hearing, on March 30, 2005, before the Court on cross-motions for summary judgment filed by Cadet Manufacturing Company (Cadet) and Port of Vancouver, USA (Port).  After considering the pleadings, exhibits, and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

## I

## FINDINGS OF FACT

     The material facts in this case relevant to the motions before the Court are not in dispute.[1]  Swan Manufacturing (Swan) operated a manufacturing facility on leased property, south of Fourth Plain Boulevard, near Kotobuki Way in Vancouver, Washington (Swan Site),

---

[1]Most of the agreed facts are taken directly from Cadet's Memorandum in Support of Motion for Summary Adjudication under 11 U.S.C. § 502(e)(1)(B) as agreed to by the Port in its Appendix to the Port's Response to Cadet's Motion for Summary Adjudication: Disputed and Agreed Facts.

MEMORANDUM DECISION - 1

between 1956 and 1964. In 1964, Swan relocated to a new location north of Fourth Plain Boulevard. Swan operated at this site until 1972, when Cadet purchased all of Swan's assets and liabilities, including the plant north of Fourth Plain Boulevard (Cadet Site). Cadet continues to operate at this site today.

The Port purchased the Swan Site in 1982. The Swan Site was occupied by Rag's Tavern at the time of purchase. The Port later demolished the building used by Rag's Tavern and paved over the property. The Swan Site was then used as a short-term parking lot for automobiles shipped from overseas.

In the mid-1990's, contamination was discovered at the Swan Site through preliminary investigations performed by the City of Vancouver in preparation for improvements to Mill Plain Boulevard. In December, 1997, the Port engaged Parametrix, an environmental consulting firm, to further investigate the contamination. Tests revealed that the contamination was primarily from trichloroethylene (TCE).

The Washington State Department of Ecology (DOE) has identified two sources of chlorinated solvent contamination; the first originates from the original Swan Site, and the second from the Cadet Site. Chlorinated solvents were used as a degreaser at both sites. Cadet continued to use chlorinated solvents to degrease metal parts at its site until approximately 1976.

Contamination from both the Swan Site and Cadet Site is migrating, and the plumes from the two sites have merged into what is referred to as the "commingled plume." The commingled plume is generally migrating to the south of Fourth Plain Boulevard, and allegedly may have been joined by contaminates from another site, the ST Services Site, also located south of Fourth Plain Boulevard.

MEMORANDUM DECISION - 2

On March 3, 1998, the DOE issued a formal notice to the Port naming it as a potentially liable person (PLP) for contamination found at the Swan Site. Pursuant to Washington's Model Toxics Control Act (MTCA), a PLP is "any person whom the department finds, based on credible evidence, to be liable under RCW 70.105D.040." RCW 70.105D.020(16). On April 14, 1998, the DOE issued the Port a letter, in which the DOE determined that the Port was a PLP. This letter states:

> We have received your letter of April 3, 1998 and evaluated your comments. Based on the information available to date, the Department of Ecology finds that credible evidence exists which supports your status as a potentially liable person for the release that occurred in the vicinity of building 2220. On the basis of this finding, the Department of Ecology has determined that you are a Potentially Liable Person (PLP) with regard to this site.[2]

The Port has entered into two agreed orders with the DOE regarding the Swan Site. In both agreed orders, a list of "Ecology Determinations" provides that by "letter dated April 14, 1998, Ecology notified the Port of Vancouver of its status as a 'potentially liable person' under RCW 70.105D.040 after notice and opportunity for comment."[3] The agreed orders require the Port to investigate and characterize the contamination and to prepare a feasibility study stating how best to treat the plume. The agreed orders provide that if the Port fails to comply, the Washington State Attorney General has the power, pursuant to RCW 70.105D.050, to seek enforcement of the agreed orders in court.

On August 19, 1999, the DOE issued a notice naming Cadet as a potentially liable person for the Swan Site, noting that Swan had operated at that site during the 1960s. The DOE explained that Cadet had acquired Swan in 1972, and that "[c]redible evidence exists

---

[2]Criswell Decl. Ex. CC (02-18-05).

[3]Criswell Decl. Ex. P at 2-3, Ex. Q at 4 (02-18-05).

MEMORANDUM DECISION - 3

indicating that a release of a hazardous substance occurred at this site during the time it was occupied by Swan Manufacturing."[4]   The letter details the "evidence supporting these findings," and concludes that "[a]s a result of this evidence, Cadet Manufacturing has been identified as potentially liable for the release at this site," along with the Port, which has been previously named as a potentially liable person.[5]   Neither party has presented a feasibility study to the DOE proposing a final remedy for treatment of the Swan source area or the commingled plume.   On September 15, 1999, the DOE issued a notice naming Cadet as a potentially liable person for the Cadet Site.   Both of the PLP notices concerning to the Cadet and Swan Sites were received by Cadet postpetition.   Cadet has entered into an Agreed Order with the DOE regarding the Cadet Site.

Cadet filed a voluntary petition for relief under Chapter 11, Title 11 on January 14, 1999.   An order confirming Cadet's Third Amended Plan of Reorganization as Modified (Plan) was entered on January 18, 2000.   The Plan sets forth Cadet's obligations to environmental claimants such as the Port.   Environmental claimants are separately classified as Class 14 claimants, and general unsecured creditors are classified as Class 12 claimants.   The environmental claims are to be paid by Cadet's insurers, and if not paid in full, holders of Class 14 claims may participate in the Plan as Class 12 claimants, subject to a credit against the Class 12 claim for amounts received from insurers.   The Plan also has a "clawback provision" that requires the reorganized Cadet to restore insurance proceeds, other than the first $400,000 paid, for the benefit of other environmental claimants, "if it is subsequently determined that payment of the DOE Claim from insurance proceeds resulted in the DOE

---

[4]Criswell Decl. Ex. DD at 1 (02-18-05).

[5]Criswell Decl. Ex. DD at 1 (02-18-05).

Claim receiving more than a Pro Rata share of proceeds among all Environmental Claims whose claims are covered by such policies."[6]

The DOE has not filed a proof of claim in Cadet's bankruptcy case. The Plan, however, treats the DOE's claim as to the Cadet Site as an Allowed Class 14 Claim. On May 30, 2000, the Unsecured Creditors Committee filed a motion to estimate environmental claims. The Unsecured Creditors Committee's motion was dismissed without prejudice by court order entered November 18, 2002.

The Port has filed a proof of claim against Cadet, with a complaint attached. The Port contends that Cadet should reimburse the Port for amounts that the Port will pay to remediate environmental contamination at the Swan Site. In its proof of claim, the Port alleges that the "environmental contamination at the [Swan] Site and at other Port property is the result of a release or releases of hazardous substances by Swan Manufacturing Company."[7] The Port also alleges that "[r]elease of hazardous substances from the Cadet Property contaminated groundwater and has migrated underneath the [Swan] Site and contributed to groundwater and soil contamination at the [Swan] Site,"[8] and that the "Port's environmental investigation and remediation activities at the [Swan] Site and other Port property are ongoing and are expected to continue for several years."[9] The Port alleges that, under RCW 70.105D.080 of the MTCA, the Port should recover "any future damages," including "future remedial action costs" and "exposure to future government oversight and/or enforcement actions related to

---

[6]Plan § 4.14.1 (99-30304, No. 619).

[7]Criswell Decl. Ex. K at 3-4 ¶ 9 (02-18-05).

[8]Criswell Decl. Ex. K at 5 ¶ 25 (02-18-05).

[9]Criswell Decl. Ex. K at 4 ¶ 14 (02-18-05).

MEMORANDUM DECISION - 5

the release or releases of hazardous substances."[10]  In its proof of claim, the Port states that the amount of its claim as of the petition date was $14,000,000.

A Final Decree and Order Closing Case was prepared by the Plan Administrator for Cadet's bankruptcy estate and entered by this Court without objection on December 19, 2002. In the Order, the Court specifically retained jurisdiction over the pending objection by Cadet to the Port's claim.  Cadet moved ex parte to reopen its case on April 29, 2004, in order to file a complaint against Underwriters Laboratories, Inc. for declaratory and injunctive relief to enforce the discharge provision of its confirmed Plan.  The case was reopened on April 29, 2004, the complaint was filed, and an order re-closing Cadet's bankruptcy case was entered on May 7, 2004.

Cadet filed an objection to the Port's proof of claim on December 29, 2000.  A hearing on Cadet's objection to the proof of claim was first set for February 28, 2001, and has been continued several times.  A two-week evidentiary hearing on the objection was initially scheduled for January, 2003.  On August 30, 2002, the Port moved for an 11-month setover, from January, 2003, to December, 2003, so that the Port could select a remedy and liquidate its costs.  Cadet did not oppose this motion.  On September 11, 2002, the Court granted the Port's motion and set the evidentiary hearing for January, 2004.  In May, 2003, after the Clark Public Utilities prepared a wellfield proposal study, the parties jointly asked for another continuance.  At a hearing held May 7, 2003, the Court agreed to another year setover to January, 2005.  In February, 2004, the Port again moved for continuance of the evidentiary hearing date.  On this occasion, the Port sought to continue the evidentiary hearing until 2007. Cadet filed an objection, and on March 3, 2004, the Court denied the Port's motion.  To

---

[10]Criswell Decl. Ex. K at 4-5 ¶ 22 (02-18-05).

accommodate counsels' schedules, the Court agreed to a short setover, and reset the evidentiary hearing to begin on April 11, 2005.

On June 3, 2004, Cadet filed a motion to amend its objection to the Port's claim to add an affirmative defense based on 11 U.S.C. § 502(e)(1)(B).  An order granting Cadet's motion to amend was entered on July 23, 2004.

On December 21, 2004, the Port filed a memorandum requesting that the Court issue a declaratory ruling determining Cadet's percentage of liability for future remedial action costs. Cadet objected arguing that the Port's claim for future environmental cleanup costs should instead be estimated and liquidated under 11 U.S.C. § 502(b) and (c). [11]

On February 18, 2005, the Port filed a motion for summary judgment on Cadet's 11 U.S.C. § 502(e)(1)(B) affirmative defense.  Cadet filed a cross-motion for summary judgment on the 11 U.S.C. § 502(e)(1)(B) issue the same day.

**II**

**ISSUES**

A.  Whether the Port's claim for future remedial action costs should be denied under 11 U.S.C. § 502(e)(1)(B).

B.  Whether the Port's claim for future remedial action costs should be estimated as a dollar amount under 11 U.S.C. § 502(c).

C.  Whether the Court should issue a declaratory ruling apportioning liability for future remedial action costs.

─────────────────

[11]The Court will treat the 11 U.S.C. § 502(b) and (c) issues as cross-motions for summary judgment even though formal motions for summary judgment on these issues were never filed.

MEMORANDUM DECISION - 7

**III**

**CONCLUSIONS OF LAW AND DISCUSSION**

**A.  Law on Summary Judgment**

The party seeking summary judgment bears the burden of demonstrating that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986).  All inferences drawn from the evidence presented must be drawn in favor of the party opposing summary judgment, and all evidence must be viewed in the light most favorable to that party.  Summary judgment should be granted if, after taking all reasonable inferences in the nonmoving party's favor, the court finds that no reasonable jury could find for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S. Ct. 2505, 2514 (1986).  The responding party must present affirmative evidence in order to defeat a properly supported motion for summary judgment.  The responding party may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  <u>Liberty Lobby</u>, 477 U.S. at 256, 106 S. Ct. at 2514.

**B.  11 U.S.C. § 502(e)(1)(B)**

11 U.S.C. § 502(e)(1)(B) provides in relevant part:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on, or has secured, the claim of a creditor, to the extent that—
>
> . . . .
>
> (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution[.]

A claim will be disallowed under 11 U.S.C. § 502(e)(1)(B) if it meets the following three requirements:  "(1) the claim is for reimbursement or contribution; (2) the party asserting the

MEMORANDUM DECISION - 8

claim is liable with the debtor on the claim of a creditor; and (3) the claim is contingent at the time of its allowance or disallowance." In re Dant & Russell, Inc., 951 F.2d 246, 248 (9th Cir. 1991). The parties agree that only two of the three elements are at issue in this case. The two are whether the claim is contingent and whether there is co-liability.

   1. **Is the Port's claim contingent?**

In order for a claim to be disallowed under 11 U.S.C. § 502(e)(1)(B), the claim must be "contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution." 11 U.S.C. § 502(e)(1)(B).

In arguing that the Port's claim is not contingent, the Port relies on a definition of that term that stems from the Ninth Circuit Court of Appeals' decision in In re Fostvedt, 823 F.2d 305 (9th Cir. 1987). In Fostvedt, the court determined that a debt is noncontingent if all events giving rise to liability occurred prior to the filing of the bankruptcy petition. Fostvedt, 823 F.2d at 306-07; see also In re Nicholes, 184 B.R. 82, 88 (9th Cir. BAP 1995). The Port also relies on In re Dill, 30 B.R. 546 (9th Cir. BAP 1983), aff'd, 731 F.2d 629 (9th Cir. 1984), and In re Audre, Inc., 216 B.R. 19 (9th Cir. BAP 1997).

None of the above cited cases, however, addressed the issue of whether a claim was contingent for purposes of 11 U.S.C. § 502(e)(1)(B). In both Fostvedt and Nicholes, the issue was whether a debt was contingent under 11 U.S.C. § 109(e). Dill addressed the definition of contingent under 11 U.S.C. § 303(b)(1), and Audre defined the term for purposes of 11 U.S.C. § 502(c). The Court is not aware of any Ninth Circuit decision specifically examining the meaning of the term pursuant to 11 U.S.C. § 502(e)(1)(B).[12]

_____

[12]The Ninth Circuit in Dant & Russell did not reach the issue of whether the claim was contingent under 11 U.S.C. § 502(e)(1)(B). "Because we find that BN's claim fails to satisfy the co-liability requirement, we need not reach the question of contingency." Dant & Russell, 951 F.2d at 248.

MEMORANDUM DECISION - 9

In the context of 11 U.S.C. § 502(e)(1)(B), contingent has been primarily interpreted by courts to mean "unfunded." See, e.g., In re Tri-Union Dev. Corp., 314 B.R. 611, 616-17 (Bankr. S.D. Tex. 2004); In re Cottonwood Canyon Land Co., 146 B.R. 992, 997 (Bankr. D. Colo. 1992); In re Baldwin-United Corp., 55 B.R. 885, 894-95 (Bankr. S.D. Ohio 1985). Although the term "contingent" is not defined anywhere in the Bankruptcy Code, review of the legislative history and the purpose behind 11 U.S.C. § 502(e)(1)(B) provides some guidance.

The purpose of 11 U.S.C. § 502(e)(1)(B) is to prevent competition between a creditor and its guarantor for the limited proceeds of an estate. Dant & Russell, 951 F.2d at 248. According to the legislative history, 11 U.S.C. § 502(e)

> requires disallowance of the claim for reimbursement or contribution of a codebtor, surety or guarantor of an obligation of the debtor, unless the claim of the creditor on such obligation has been paid in full. The provision prevents competition between a creditor and his guarantor for the limited proceeds in the estate.

H.R. Rep. No. 95-595, at 354 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6310; S.R. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5851.

Not only do the legislative history and all cases defining contingent for purposes of 11 U.S.C. § 502(e)(1)(B) equate the term with unfunded, the meaning suggested by the Port also conflicts with a plain reading of the statute. Under 11 U.S.C. § 502(e)(1)(B), the claim must be "contingent as of the time of allowance or disallowance." The Port's claim in this case has not yet been allowed or disallowed. Yet, the definition proposed by the Port based on the Fostvedt line of cases, limits the Court's inquiry to events occurring prepetition. The Court will not interpret the term to be limited to prepetition events when the statute itself requires the Court to examine the issue at a different period in time.

MEMORANDUM DECISION - 10

The Port has not yet satisfied the underlying claim of the DOE. This will not occur until both the Swan Site and commingled plume have been completely remediated to the satisfaction of the DOE. The Port's claim for future response costs is therefore contingent for purposes of 11 U.S.C. § 502(e)(1)(B).

## 2. Is there co-liability?

Co-liability under 11 U.S.C. § 502(e)(1)(B) is typically the more controversial of the three prongs and has been the subject of numerous law review articles and court decisions. In this case, the arguments both for and against finding co-liability have centered on two discrete issues: (1) whether the Port is under any external legal compulsion to perform any remediation activity, and (2) whether discharge in bankruptcy of the DOE's claim against Cadet for the Swan Site negates co-liability.[13]

### a. Legal Compulsion

Relying primarily on the Ninth Circuit's decision in Dant & Russell, the Port argues that it is not co-liable with Cadet on claims of the DOE because it is not under any external legal compulsion to remediate.

In Dant & Russell, a property owner, Burlington Northern (BN), brought an action against the debtor tenant for reimbursement of hazardous waste cleanup costs under 42 U.S.C.A. § 9607(a)(4)(B) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The debtor sought disallowance of the claim under 11 U.S.C. § 502(e)(1)(B). The Ninth Circuit held that 11 U.S.C. § 502(e)(1)(B) was not a bar to BN's claim because there was no third party creditor in the case. There was no third party creditor

---

[13]At the March 30, 2005 hearing, the Port admitted that the argument raised in the pleadings that its affirmative defenses defeat any co-liability between the Port and the DOE, raises issues of fact that are not appropriate for resolution on summary judgment. The Court will therefore not examine that issue in this decision.

MEMORANDUM DECISION - 11

because BN had not been ordered by the EPA to perform future cleanup, and any future cleanup "very well might be at the instigation of BN." Dant & Russell, 951 F.2d at 249. The Ninth Circuit reasoned that "[t]he concerns addressed by § 502(e)(1)(B) are not implicated in this case because third parties are not competing over [the debtor's] funds for cleanup. BN's claim against these funds arises from no external legal compulsion–there is no third party creditor here." Dant & Russell, 951 F.2d at 248.

As in Dant & Russell, the Port argues that it is under no legal compulsion to remediate. Cadet, on the other hand, takes the opposite position and points to the fact that the Port has been designated as a PLP by the DOE and entered into agreed orders with the DOE with respect to the Swan Site. In Dant & Russell, however, the materials submitted by the parties indicate that both the debtor and BN had been designated as potentially responsible parties under CERCLA. Despite this designation, the Ninth Circuit determined that there was no co-liability. This fact standing alone, therefore, is not sufficient to establish co-liability for purposes of 11 U.S.C. § 502(e)(1)(B).

The same is true of the agreed orders. Although the Port is working with the DOE under two agreed orders, the DOE has not yet ordered any of the cleanup. This is not because the DOE lacks such authority. The DOE can issue an enforcement order pursuant to WAC 173-340-540, compelling a party to remediate contamination. The DOE, however, has not issued such an order to either party.

The legal compulsion required by Dant & Russell is also not established by the email received by one of Cadet's attorneys from Craig Rankine, the DOE project manager, on March 11, 2005.[14] In this email, Rankine indicates that the DOE will be looking to both the

_____

[14]Dunbar Aff. Ex. 40 (03-18-05).

MEMORANDUM DECISION - 12

Port and Cadet to participate in further assessment of the commingled plume. Although further assessment may be required, future cleanup by the Port has not been ordered. This is similar to the situation present in <u>Dant & Russell</u>, as established by an affidavit from the debtor's counsel in that case, Christopher R. Hermann, that was part of the appellate record.[15] Hermann stated that "it was still uncertain what the cleanup would cost since the third consent decree provided for an additional study rather than a fixed schedule for and estimate of the cost of the cleanup."[16] As in <u>Dant & Russell</u>, although additional study may be necessary, it is still uncertain what future cleanup by the Port will be required.

The Court acknowledges that the framework created by the Ninth Circuit for analyzing this issue is not easy to apply. It is difficult to envision a scenario, even based on the facts in <u>Dant & Russell</u>, where a party such as the Port or BN will perform a purely voluntary cleanup. As a practical matter, the motivation for any remediation is the threat of liability by the administering agency. This Court, however, is bound to follow the law set forth by the Ninth Circuit. Absent legal compulsion, there is no co-liability.

### b. Discharge of Liability

A determination that there is no co-liability in this case is further supported by the fact that any liability Cadet has to the DOE for the Swan Site has been discharged. In examining this issue, the Court has separately reviewed the effect of discharge as to the Swan Site and commingled plume.

---

[15]Dunbar Aff. Ex. 38 (03-18-05).

[16]Dunbar Aff. Ex. 38 at 2-3 ¶ 5 (03-18-05).

MEMORANDUM DECISION - 13

### i.  Swan Site

The Port argues that there is also no co-liability in this case because Cadet's liability to the DOE as to the Swan Site has been discharged.[17]  Presumably, the parties' position is that Cadet's liability to the DOE on the Swan Site has been discharged because Cadet listed the DOE on Schedule F of its bankruptcy schedules as holding a disputed, contingent and unliquidated claim valued at $0, the DOE received notice of the bankruptcy filing, yet chose not to participate in the case and did not file a claim.  Cadet's liability to the DOE on the Swan Site was therefore discharged when its Plan was confirmed.  "Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan– (A) discharges the debtor from any debt that arose before the date of such confirmation. . . ." 11 U.S.C. § 1141(d)(1)(A).

Although the DOE holds a Class 14 claim against Cadet with respect to the Cadet Site under the confirmed Plan, there is no such provision with respect to the Swan Site.  Cadet could have filed a claim on the DOE's behalf, but chose not to.  <u>See</u> 11 U.S.C. § 501(c); Fed. R. Bankr. P. 3004.  Accordingly, any liability that Cadet had to the DOE with respect to the Swan Site has been discharged.  Based on these facts, Cadet and the Port are not co-liable to the DOE for future cleanup costs at the Swan Site.

### ii.  Commingled Plume

Cadet distinguishes between its liability as to the Swan Site and the commingled plume and argues that even if its liability as to the Swan Site has been discharged, its liability as to the commingled plume has not been discharged.  Thus, there is co-liability as to the

---

[17]The Court understands that the DOE may take a contrary position and is therefore making no finding as to whether the DOE's claim against Cadet for the Swan Site has been discharged.  The Court will merely assume this fact for purposes of summary judgment as it has been set forth by the parties.

MEMORANDUM DECISION - 14

commingled plume, and this Court should disallow that portion of the Port's claim for future remediation costs. The Court is not persuaded by this argument.

The premise of Cadet's argument fails because it appears to treat this plume as an independent site, without recognizing its source. The commingled plume is the result of contamination that has migrated from the Swan and Cadet Sites, and possibly unrelated third parties who are not represented in these proceedings, and merged into a single plume. The fact that the contamination has migrated, however, does not change the nature of the parties' liability to the DOE for its remediation. The parties are in agreement that Cadet has no further liability to the DOE related to the Swan Site because of the bankruptcy discharge. Likewise, the Port has never had any liability to the DOE for any contamination at or migrating from the Cadet Site. As there is no co-liability between the Port and Cadet to the DOE for the sources of the contamination, there can be no co-liability for the area where the contamination meets. The Court concludes that there is no co-liability between the parties for purposes of 11 U.S.C. § 502(e)(1)(B) for the commingled plume.

In rendering its decision, the Court is not taking the position that the mere failure to file a claim by the DOE is dispositive. See, e.g., In re Wedtech Corp., 85 B.R. 285, 289 (Bankr. S.D. N.Y. 1988). The literal language of 11 U.S.C § 502(e)(1)(B) appears to disallow a codebtor's contingent claim, whether or not a claim has been filed postpetition. This section directs disallowance of the claim of a codebtor that is liable with the debtor on the "claim of a creditor." 11 U.S.C. 502(e)(1)(B). A "claim" has been broadly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). A "creditor" is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A).

MEMORANDUM DECISION - 15

The parties agree that the DOE held a prepetition claim against the estate.  The DOE is therefore a creditor as defined by the Bankruptcy Code even though a claim was not filed. However, the Court concludes that this does not end the inquiry.   Under 11 U.S.C. § 502(e)(1)(B), the Debtor must still establish that both it and the Port are "liable" to the DOE. See In re Hemingway Transp., Inc., 993 F.2d 915, 926 (1st Cir. 1993).

The Court understands that the case law on this issue is not entirely consistent with the Court's position.  For instance, in Cottonwood Canyon Land, the bankruptcy court disallowed a claim for future remediation costs by a prepetition purchaser of the debtor's property under 11 U.S.C. § 502(e)(1)(B).  Cottonwood Canyon Land, 146 B.R. at 997.  The court rejected the purchaser's argument that there was no co-liability because a claim had not been filed by the government agency, because "application of section 502(e) is not premised on the actual filing of multiple claims but, rather, on the existence of such claims." Cottonwood Canyon Land, 146 B.R. at 997.

The Sixth Circuit, however, reached the opposite conclusion in In re Eagle-Picher Indus., Inc., 131 F.3d 1185 (6th Cir. 1997).  In determining whether a party was co-liable with the debtor, the court noted that a creditor who fails to file a timely claim "will no longer be considered a creditor with respect to that claim, unless the creditor is entitled to one of the exceptions for late filings." Eagle-Picher, 131 F.3d at 1188.  The Sixth Circuit remanded for a determination as to whether a late filing by the EPA might be possible.  If so, the parties would be co-liable.  Eagle-Picher, 131 F.3d at 1188-89; see also Hemingway Transp., 993 F.2d at 925-28 (First Circuit remanded to give trustee opportunity to file surrogate claim on agency's behalf, and held that if trustee failed to file a timely claim, objection under 11 U.S.C. § 502(e)(1)(B) should be dismissed).  The Sixth Circuit further determined that on remand, the

bankruptcy court could take into account a consent agreement entered into between the EPA and the debtor while the appeal was pending that allowed the agency to file claims against the debtor in the future.  Eagle-Picher, 131 F.3d at 1189-90.

The decisions by the First and Sixth Circuits, as well as the Ninth Circuit in Dant & Russell, demonstrate the reluctance of the circuit courts to apply the literal language of 11 U.S.C. § 502(e)(1)(B) and disallow environmental claims when the potential for double liability does not exist.  The reluctance presumably stems from the fact that such a ruling would produce inequitable results while also failing to serve the purpose for which the statute was created.  This Court finds the position taken by the circuits to be highly persuasive under the facts of this case.

The U.S. Supreme Court case of United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S. Ct. 1026, 1031 (1989), is routinely cited for the proposition that a court is required to enforce statutory language without further analysis if the language is clear.  The Supreme Court, however, also stated that in the "'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' . . . the intention of the drafters, rather than the strict language, controls."  Ron Pair Enters., Inc., 489 U.S. at 242 (citation omitted) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S. Ct. 3245, 3250 (1982)).  This Court believes that this is one of those rare instances in which the intent of the drafters should be upheld.

The case law in this area and creative solutions fashioned by the courts when faced with these issues, highlight the difficulty of reconciling environmental and bankruptcy law.  In many ways, the goals of both are similar, i.e., encouraging prompt cleanup and expeditiously resolving a debtor's bankruptcy case to provide a fresh start.  In other ways, however, and as seen in this case, the two goals do not always appear compatible.  Finding a balance between

MEMORANDUM DECISION - 17

the two, while acting within the confines of the applicable statutes and binding case law, is difficult. The Court is of the opinion that its decision on this issue is the best alternative to achieve that balance.

This Court finds persuasive a concurring opinion written by the then Chief Judge of the Sixth Circuit in the case of Eagle-Picher. He wrote separately out of concern that the majority decision could potentially be read as allowing a party to "hide behind the shield of a bankruptcy claim to escape responsibility for their lack of sound environmental stewardship." Eagle-Picher, 131 F.3d at 1191. The concern was that the claim would be disallowed under 11 U.S.C. § 502(e)(1)(B), the debtor would raise bankruptcy as a defense if the agency ever did bring a claim, the defense would be accepted, and the debtor would "be able to walk away from the mess it made without bearing any responsibility for it." Eagle-Picher, 131 F.3d at 1191. As stated in the concurrence, "[t]his cannot be allowed." Eagle-Picher, 131 F.3d at 1191. As in that case, Cadet is taking the position that its liability to the DOE for the Swan Site has been discharged. If this Court were to disallow the Port's claim in this case, it would be allowing Cadet to escape any responsibility for the environmental liability imposed upon it under state law. Allowing such a result would not serve the purpose or intent of MTCA or 11 U.S.C. § 502(e)(1)(B).

As stated previously, the purpose behind the enactment of 11 U.S.C. § 502(e)(1)(B) was to protect the limited assets of a bankruptcy estate from duplicate claims. The threat of duplicate claims, however, is not present in this case. Cadet has taken the position that its liability to the DOE for the Swan Site has been discharged. As stated by the concurrence in Eagle-Picher, a debtor cannot take the position that its liability on such claims has been discharged while also seeking disallowance under 11 U.S.C. § 502(e)(1)(B). Such positions are not only inconsistent, but if allowed, create a loophole that would contravene clear legislative intent in enacting the environmental laws as well as 11 U.S.C. § 502(e)(1)(B).

MEMORANDUM DECISION - 18

Finally, not only is the threat of double recovery non-existent in this case because of the bankruptcy discharge, it is undisputed that the party at risk in this case is not the debtor, but its insurance carriers.  See In re Pettibone Corp., 162 B.R. 791, 810 (Bankr. N.D. Ill. 1994).  "Section 502(e)(1)(B) is not a means of immunizing debtors from contingent liability, but instead protects debtors from multiple liability on contingent debts."  In re Allegheny Int'l, Inc., 126 B.R. 919, 923 (W.D. Pa. 1991), aff'd, 950 F.2d 721 (3rd Cir. 1991).  Such multiple liability is not present in this case.  For these reasons, it is not only consistent with the Bankruptcy Code, but also as a matter of public policy to not disallow the Port's claim in this case under 11 U.S.C. § 502(e)(1)(B).

### C.  11 U.S.C. § 502(c)

**1.  Should the claim be estimated?**

11 U.S.C. § 502(c) provides that "[t]here shall be estimated for purpose of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case[.]"

### a.  Unliquidated

The Court concludes that the Port's claim in this case for future response costs is unliquidated.  A debt is liquidated if the amount of the debt is readily determinable.  In re Slack, 187 F.3d 1070, 1073 (9th Cir. 1999).  Whether a debt is subject to ready determination depends on whether the amount is easily calculable or whether an extensive hearing will be needed to determine the amount of the debt.  In re Ho, 274 B.R. 867, 873 (9th Cir. BAP 2002) (citing Slack, 187 F.3d at 1074).

The Port's claim is not subject to ready determination.  A two-week evidentiary hearing has been set on the Port's claim.  Based on the materials presented for the summary judgment hearings, testimony from numerous witnesses and experts will be needed in order

MEMORANDUM DECISION - 19

to liquidate the Port's claim. The Port's claim is concluded to be unliquidated under 11 U.S.C. § 502(c).

As the Port's claim for future response costs is unliquidated, the Court is not required to determine whether it is also contingent for purposes of 11 U.S.C. § 502(c).[18]

### b. Unduly Delay

There is no need to estimate a claim unless awaiting final resolution would unduly delay the administration of the case. 11 U.S.C. § 502(c)(1); Swift v. Bellucci (In re Bellucci), 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990). Determining whether liquidation of a claim would unduly delay a case necessarily requires an "exercise of judicial discretion." Bellucci, 119 B.R. at 778. In order for the claims estimation process of 11 U.S.C. § 502(c) to be mandatory under the plain language of the statute, the delay must be undue. The delay is undue if it is unjustifiable. In re Dow Corning Corp., 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997).

Courts have examined several factors in making this determination. For instance, in Bellucci, the court focused on whether the uncertain status of the claim would impede the debtor's ability to prepare a plan of reorganization. Belluccci, 119 B.R. at 778. Similarly, the Second Circuit Court of Appeals has concluded that the issue as to whether claims should have been estimated was moot in a case where the debtor's plan had been substantially consummated. In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993). The Dow Corning court looked to a number of factors, including the accuracy of the proposed estimation process. Dow Corning, 211 B.R. at 563.

---

[18]By its express terms, 11 U.S.C. § 502(c) applies to claims that are "contingent or unliquidated." 11 U.S.C. § 502(c)(1) (emphasis added).

MEMORANDUM DECISION - 20

The Court concludes that postponing liquidation of the Port's claim will not unduly delay the administration of Cadet's case. Under the Plan, Cadet classified the environmental claims as prepetition claims to be discharged under 11 U.S.C. §1141(d). See <u>Jensen v. California Dep't of Health and Servs. (In re Jensen)</u>, 995 F.2d 925, 930-31 (9th Cir. 1993) (applying fair contemplation test to find that claims for hazardous waste cleanup costs were discharged). The DOE has elected not to file a proof of claim, nor has Cadet filed one on its behalf. The Plan establishes a reservoir of insurance to cover the Port's allowed environmental claim to the extent there is coverage. Ongoing litigation over the extent of future environmental remediation does not substantively affect Cadet monetarily, except for the possibility that the reorganized Debtor may have future liability due to the "clawback" provisions of the Plan.[19]

The directors/owners of Cadet argue that they are experiencing ongoing harm because they are unable to refinance or sell the business due to the potential liability of environmental claims. While this may be true, the concerns of each of the parties and the accuracy of the process must be considered in determining whether estimation of claims is justified. For instance, it is estimated that the costs of the remediation may be ongoing for 50 to 100 years. The actual costs to be expended are not known, as a final remedy has not been selected and depends, in part, on the actions of third parties not before this Court, such as Clark Public Utilities and the DOE. Costs of remediation are currently estimated to be between 20 and 60 million dollars, with in excess of seven million dollars already expended. As a practical matter, an accurate estimation of the future costs through litigation, prior to a final remedy being selected, is all but impossible in this case.

_____

[19]Plan § 4.14.1 (99-30304, No. 619).

MEMORANDUM DECISION - 21

Additionally, this Court concludes that unless undue delay is demonstrated, the legitimate interests of the debtor, creditors, and environmental laws are best served in most cases by limiting the application of 11 U.S.C. § 502(c) to those instances where estimation is necessary to determine the creditor's voting rights in the bankruptcy proceeding with ultimate liquidation deferred until the normal environmental process is complete.  See In re Chateaugay Corp., 944 F.2d 997, 1006 (2d Cir. 1991); see also Joel M. Gross and Suzanne Lacampagne, Bankruptcy Estimation of CERCLA Claims:  The Process and the Alternatives, 12 Va. Envtl. L.J. 235, 265-69 (1993) (concluding that requiring estimation of CERCLA claims during the course of bankruptcy, other than for voting purposes, is generally inappropriate and unnecessary to meet bankruptcy goal of debtor rehabilitation).  Liquidation of the claims of the Port will proceed, no matter whether the claims estimation hearing is held.  Consequently, since the administration of the estate is not unduly delayed, the harm to the parties by a widely inaccurate estimation hearing in the name of expediency is not justified.

Further, Cadet's Plan was confirmed over five years ago in January, 2000. Distributions to unsecured creditors will not be affected by the claims estimation process. Distributions to unsecured creditors have been ongoing for the past four years and plan payments to such creditors are nearly complete.  Once the final plan payment to unsecured creditors is made, the Port will have no further right to payment as a Class 12 claimant. The duly appointed Plan Administrator has represented to the Court that the case has been fully administered.  Although it acknowledges that environmental claims remain pending, a Final Decree has been entered in this case.  The Court is unaware of a single case in which a court made a determination to estimate a claim in a case where the Plan had been confirmed, a final decree entered, and the case closed.  The lack of case law is predictable.  Simply put,

MEMORANDUM DECISION - 22

declining to estimate an unliquidated claim cannot unduly delay the administration of a case that has been fully administered.

The Court is not holding that 11 U.S.C. § 502(c) may never be used to estimate future response costs. <u>See</u> <u>In re Allegheny Int'l Credit Corp.</u>, 104 F.3d 601 (3rd Cir. 1997); <u>In re National Gypsum Co.</u>, 139 B.R. 397, 415 (N.D. Tex. 1992) (referring case back to the bankruptcy court to estimate the United States' claim).  The Bankruptcy Code, however, does not mandate estimation in all cases.  Rather, estimation is only required under 11 U.S.C. § 502(c) where it is necessary to avoid undue delay in the administration of the case.  For the reasons set forth above, it is concluded that estimation of the Port's claim is not mandated by 11 U.S.C. § 502(c), as the failure to estimate will not unduly delay the administration of this bankruptcy case.  The Court further declines to exercise its discretion to estimate the future remedial costs at this time.

**2.**   **<u>Should the Court enter a declaratory judgment apportioning liability for future costs</u>?**

The Port argues that even though the claim should not be estimated under 11 U.S.C. § 502(c), the Court should still enter a declaratory judgment apportioning liability for future costs.  In support of its argument, the Port relies primarily on a statement made by the Ninth Circuit in <u>Dant & Russell</u>.  In <u>Dant & Russell</u>, the Ninth Circuit stated that

> [t]his holding does not interfere with the powers of the bankruptcy court as a court of equity to establish a trust fund if the estate has assets, or to make provision for other forms of relief "necessary or appropriate to carry out the provisions of the bankruptcy code."  11 U.S.C. § 105(a).  We express no opinion on the extent of the court's discretionary powers.

<u>Dant & Russell</u>, 951 F.2d at 250. [20]

_____

[20]On remand, the matter was apparently settled and the case dismissed.  Accordingly, the lower court did not have the opportunity to further explore the extent of the court's discretionary powers.

MEMORANDUM DECISION - 23

In <u>Dant & Russell</u>, the Ninth Circuit reversed a bankruptcy court's decision awarding a fixed dollar amount for cleanup costs that had not yet been incurred, on the basis that under CERCLA, "response costs may not be recovered when there has been no commitment of resources for meeting these costs." <u>Dant & Russell</u>, 951 F.2d at 249. The Ninth Circuit further stated: "We do not hold that the bankruptcy court could not enter a declaratory decree apportioning liability for costs when and if incurred. But the court could not enter a judgment [under CERCLA] for 'incurred' costs when such costs have not been incurred." <u>Dant & Russell</u>, 951 F.2d at 250.

A review of MTCA indicates that MTCA, like CERCLA, only allows recovery of "incurred" costs. RCW 70.105D.080.[21] In accordance with <u>Dant & Russell</u>, the Port argues that the Court should therefore utilize its 11 U.S.C. § 105(a) powers to apportion liability in this case. The Court, however, is unwilling to utilize its 11 U.S.C. § 105(a) powers in this manner. 11 U.S.C. § 105(a) does not amount to "'a roving commission to do equity.'" <u>Saxman v. Education Credit Mgmt. Corp. (In re Saxman)</u>, 325 F.3d 1168, 1175 (9th Cir. 2003) (quoting <u>United States v. Sutton</u>, 786 F.2d 1305, 1308 (5th Cir. 1986)). 11 U.S.C. § 105(a) limits the equitable powers of the bankruptcy court to the issuance of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Thus, a court may exercise its equitable power only as a means to fulfill some specific Bankruptcy Code provision. <u>See</u> <u>Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197, 206, 108 S. Ct. 963, 969 (1988) ("whatever equitable powers remain in the bankruptcy courts must

---

[21]In <u>Dant & Russell</u>, the Ninth Circuit unfortunately did not directly address the issue of whether 11 U.S.C. § 502(c) or CERCLA are in conflict and, if so, which takes precedence. MTCA, unlike CERCLA, however, is a state rather than federal statute. It is probable that MTCA is preempted by the Bankruptcy Code under the Supremacy Clause, U.S. Const., art. VI, cl. 2, to the extent of any conflict, i.e., the requirement under the Code that an unliquidated claim be estimated as a dollar amount, and the prohibition under state law against such an award until costs are incurred. If preempted, resort to 11 U.S.C. § 105(a) may be unnecessary. This distinction also weighs against utilization of 11 U.S.C. § 105(a) in this case.

MEMORANDUM DECISION - 24

and can only be exercised within the confines of the Bankruptcy Code"). In this case, resort to 11 U.S.C. § 105(a) would fulfill no specific purpose since, unlike in <u>Dant & Russell</u>, the Court has concluded that estimation is not required or advisable.[22] Accordingly, this Court will not use its 11 U.S.C. § 105(a) powers to apportion liability for future costs at this time. The evidentiary hearing in October, 2005, will be limited to remedial costs already incurred.

The Court is aware that the issue of the Port's claim and Cadet's liability for future costs remains uncertain and that liquidation of the Port's claim for future response costs and an apportioning of liability will eventually be required in order for the Port to have an allowed claim for such costs under 11 U.S.C. § 502(b). Although the Bankruptcy Code does contain a mechanism for estimation of unliquidated claims under 11 U.S.C. § 502(c), it does not mandate, however, short circuiting the statutory environmental claims process if there is no undue delay to the administration of the case. The Court has concluded that it is under no obligation to set the Port's claim as a dollar amount or to establish percentages of liability in this case and declines to exercise its discretion to fix the remedial costs prior to a final remedy being selected.

On May 26, 2005, at 10:30 a.m., the Court will hold a status conference to discuss the forum and the manner this case should proceed in light of the Court's decision. Prior to the status conference, the Court encourages the parties to meet and discuss these issues. Despite the Court's ruling, if both parties agree that it is more cost-effective to apportion liability for future damages at the same time the Port's claim is established for past costs, the Court may be willing to consider doing so at the October, 2005 evidentiary hearing. If this is

_____

[22]The bankruptcy court in <u>Dant & Russell</u> estimated BN's claim for future cleanup costs as a set dollar amount. Although the Ninth Circuit reversed this ruling, it did so not because the claim should not have been estimated, but because estimation of costs that have not been incurred is prohibited by CERCLA. <u>Dant & Russell</u>, 951 F.2d at 250.

MEMORANDUM DECISION - 25

the desired approach, the parties should be prepared to explain how the Court can set percentages of liability when a portion may be attributable to third parties who are not a part of this proceeding. The parties should also be prepared to discuss the effect of this ruling, if any, on the Port's common law claims and whether to continue the evidentiary hearing on future damages until, at the earliest, a final remedy is selected.

In summary, based on the reasons set forth above, the Court concludes that 11 U.S.C. § 502(e)(1)(B) does not bar the Port's claim for future response costs, estimation of the Port's claim for future response costs under 11 U.S.C. § 502(c) is not necessary to avoid undue delay in the administration of the case, and the Court is unwilling to utilize its 11 U.S.C. § 105(a) powers to apportion liability for future response costs at this time.

DATED:    May 16, 2005

_____
Paul B. Snyder
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 26