PAUL B. SNYDER
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

✓ FILED
___ LODGED
___ RECEIVED

**March 16, 2006**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____DEPUTY

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA**

In re:

CADET MANUFACTURING COMPANY,

Debtor.

Case No. 99-30304

**MEMORANDUM DECISION**

**NOT FOR PUBLICATION**

This matter came before the Court on March 13, 2006, on a Motion to Approve Settlement Agreement by Debtor with Port of Vancouver and Participating Carriers (Motion) filed by Cadet Manufacturing Company (Cadet). The Motion was opposed by Granite State Insurance Company (Granite State), who intervened in this proceeding by Court order entered February 27, 2006. Based on the pleadings and arguments presented, the Court's findings of fact and conclusions of law are as follows:

**I**

**FINDINGS OF FACT**

Swan Manufacturing (Swan) operated a manufacturing facility on leased property, south of Fourth Plain Boulevard, near Kotobuki Way in Vancouver, Washington (Swan Site), between 1956 and 1964. In 1964, Swan relocated to a new location north of Fourth Plain Boulevard. Swan operated at this site until 1972, when Cadet purchased all of Swan's assets

MEMORANDUM DECISION - 1

and liabilities, including the plant north of Fourth Plain Boulevard (Cadet Site). Cadet continues to operate at this site today.

The Port of Vancouver (Port) purchased the Swan Site in 1982. The Swan Site was occupied by Rag's Tavern at the time of purchase. The Port later demolished the building used by Rag's Tavern and paved over the property. The Swan Site was then used as a short-term parking lot for automobiles shipped from overseas.

In the mid-1990's, contamination was discovered at the Swan Site through preliminary investigations performed by the City of Vancouver in preparation for improvements to Mill Plain Boulevard. In December, 1997, the Port engaged Parametrix, an environmental consulting firm, to further investigate the contamination. Tests revealed that the contamination was primarily from trichloroethylene (TCE).

The Washington State Department of Ecology (DOE) has identified two sources of chlorinated solvent contamination; the first originates from the original Swan Site, and the second from the Cadet Site. Chlorinated solvents were used as a degreaser at both sites. Cadet continued to use chlorinated solvents to degrease metal parts at its site until approximately 1976.

Contamination from both the Swan Site and Cadet Site is migrating, and the plumes from the two sites have merged into what is referred to as the "commingled plume." The commingled plume is generally migrating to the south of Fourth Plain Boulevard, and allegedly may have been joined by contaminates from another site, the ST Services Site, also located south of Fourth Plain Boulevard.

MEMORANDUM DECISION - 2

On March 3, 1998, the DOE issued a formal notice to the Port naming it as a potentially liable person (PLP) for contamination found at the Swan Site. The Port has entered into two Agreed Orders with the DOE regarding the Swan Site.

On August 19, 1999, the DOE issued a notice naming Cadet as a PLP for the Swan Site, and on September 15, 1999, the DOE issued a notice naming Cadet as a PLP for the Cadet Site. Both of the PLP notices concerning the Cadet and Swan Sites were received by Cadet postpetition. Cadet has entered into an Agreed Order with the DOE regarding the Cadet Site.

Cadet filed a voluntary petition for relief under Chapter 11, Title 11 on January 14, 1999. An order confirming Cadet's Third Amended Plan of Reorganization as Modified (Plan) was entered on January 18, 2000.

The Port filed a proof of claim against Cadet, with a complaint attached, where the Port originally alleged that the amount of its claim as of the bankruptcy petition date was $14 million dollars. The Port's claim arises under Washington's Model Toxics Control Act (MTCA), which authorizes it to bring a private right of action for past and future remedial action costs against the parties who caused the contamination. Cadet objected to the Port's proof of claim and the Court heard cross-motions for summary judgment on March 30, 2005. On May 16, 2005, this Court issued a Memorandum Decision concluding that the issue of future remediation costs would not be decided during the forthcoming evidentiary hearing. This evidentiary hearing would be limited to a determination of liability for the remediation costs previously incurred.

The Port has engaged in aggressive efforts to treat the Swan Site. It has investigated the Swan Site and commingled plume with monitoring wells and one-time push point probes

and has treated a substantial amount of the contaminated soils and injected neutralizing chemicals into the contamination at the Swan Site. The Port estimates that its remedial action costs to date are approximately $13.5 million dollars. The Port's consultants estimate that future remediation at the Swan Site will cost over $18 million dollars. Accordingly, the total estimated cost of the Swan Site cleanup, including both past and future costs, is approximately $32 million dollars.

Cadet has also aggressively investigated the contamination and has engaged in ongoing remediation efforts pursuant to its Agreed Order with the DOE. Cadet has 55 monitoring points in order to monitor the commingled plume, and has begun remediation efforts at the Cadet Site through processes referred to as air sparging and sail vapor extraction. In the adjacent neighborhood, Cadet has also placed several recirculating groundwater treatment wells. In order to satisfy the DOE claim at the Cadet Site, additional remediation is necessary. Cadet's experts have indicated that another $4 million dollars will be necessary to remediate the Cadet Site.

Cadet does not dispute its liability under the MTCA. Rather, Cadet's primary defense is that contamination from other sources, particularly ST Services, is responsible for up to fifty-five percent of the total contamination. Although the Port agrees that contamination from the ST Services site has commingled with the contamination from the Cadet and Swan Sites, the Port's experts opine that its percentage is significantly less than alleged by Cadet.

On February 6, 2006, Cadet filed a Motion to Approve Settlement Agreement by Debtor with Port of Vancouver and Participating Carriers. The Settlement Agreement resolves all claims between the Port and Cadet, as well as between Cadet and two of its excess carriers, Century Indemnity Company (Century) and Great American Insurance Company (Great

MEMORANDUM DECISION - 4

American). Cadet's remaining excess carrier, Granite State, is not a party to the Settlement Agreement.

In summary, the Settlement Agreement provides that Cadet will stipulate to allowance of a claim in favor of the Port for $20 million dollars. The Port will not file or seek entry of an order allowing claim unless necessary. Century and Great American will pay a total of $10 million dollars to the Port on behalf of Cadet; $6 million of which is in satisfaction of the Port's allowed claim and $4 million for the remediation of the Cadet Site. The Port agrees to not execute against Cadet for its allowed claim and will instead look solely to the Cadet environmental insurance policies for further relief. Cadet shall assign to the Port certain policy rights it has with respect to the Century and Great American policies. Cadet also assigns all of its policy rights against Granite State with respect to environmental claims. Cadet, Century and Great American will receive a release and indemnity from the Port and the Port will take full responsibility and control over the clean-up of the Cadet and Swan Sites and the commingled plume. Cadet agrees to sell the Port the property where its business is located, and the Port will then lease the property back to Cadet. The Port waives any rights it may have under the "clawback" provision contained in section 4.14.1 of Cadet's Plan. Great American and Century agree to pay Cadet $824,955 for past defense and indemnity costs and will pay 50% of up to $750,000 in defense and indemnity costs incurred between November 18, 2005 and the date the Settlement Agreement is approved by the Court. Additional defense and indemnity costs, estimated in excess of $1.4 million dollars, will be paid to Cadet from funds the Port recovers from Granite State. The entire settlement is contingent upon approval by the bankruptcy court and a claim bar order being entered by the

U.S. District Court in a pending action filed by Cadet for declaratory relief against its primary and excess insurance carriers.

## II

## CONCLUSIONS OF LAW AND DISCUSSION

### A. Federal and State Law Standards for Approval

Fed. R. Bankr. P. 9019 provides that the bankruptcy court "may" approve a compromise or settlement. This permissive language leaves the approval of a compromise to the sound discretion of the bankruptcy judge. In re Stein, 236 B.R. 34, 37 (D. Or. 1999).

According to the prevailing law of the Ninth Circuit, the party proposing the compromise has the burden of persuading the bankruptcy court that the compromise is fair and equitable. In re A & C Props., 784 F.2d 1377, 1381 (9th Cir. 1986). In determining whether a compromise is fair and equitable, the bankruptcy court must consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

A & C Props., 784 F.2d at 1381.

The settling parties also ask the Court to approve the Settlement Agreement under Washington state law. Under Washington law, the following factors are to be considered in evaluating a settlement:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.

Glover v. Tacoma General Hosp., 98 Wn.2d 708, 717, 658 P.2d 1230, 1236 (1983), rev'd on other grounds, Crown Controls, Inc. v. Smiley, 110 Wn.2d 695, 756 P.2d 717 (1988).

### B. Evaluation of the Settlement Agreement under Fed. R. Bankr. P. 9019

#### 1. Probability of Success in the Litigation

The first factor the bankruptcy court is to consider in evaluating whether a settlement agreement is fair and equitable is the probability of success in the litigation. This factor is met in this case.

Cadet does not deny its liability under the MTCA and has conceded that the Port would likely prevail on certain of its claims if this case were to proceed to trial. The Port's claim has been contentiously litigated for over six years, been the subject of voluminous discovery and expert investigations and reports and the subject of several mediation sessions. The primary issue in this case, however, is not liability, but the overall cost of the remediation and percentage of allocation of these costs between Cadet, the Port and third parties.

Granite State argues that the Court cannot properly evaluate this factor because the issue of future damages is too speculative. In support of this argument, Granite State points to the fact that this Court previously rendered a decision in which it declined to estimate such costs until a final remedy is selected. Under Granite State's argument, however, parties could never settle a case where the amount of damages is speculative. This argument is not persuasive in the context of this litigation. Although the Court ruled that it will not proceed with the evidentiary hearing on the issue of future remediation costs, this does not mean that the parties cannot settle this aspect of the Port's claim. If federal and state law standards for approving settlements are met, this Court has the discretion to approve the settlement.

Granite State relies primarily on In re AWECO, Inc., 725 F.2d 293 (5th Cir. 1984), to argue that this Court does not have a sufficient factual background to properly evaluate the Settlement Agreement. See AWECO, 725 F.2d at 299 (holding it is an abuse of discretion to approve a compromise without a sufficient factual foundation). AWECO is distinguishable in that the court in that case was evaluating, as part of a reorganization plan, a settlement with an unsecured creditor that might deprive a non-settling senior creditor of full payment. In such an instance, full and accurate information concerning the net value of the estate assets is particularly important in determining whether the settlement was fair to the senior creditor. In reaching this holding, the Fifth Circuit recognized that fair and equitable settlement of creditor's claims is the goal of bankruptcy the minute a petition is filed. AWECO, 725 F.2d at 298. In this case, Granite State is an insurer, not a creditor of Cadet. Although the Court agrees that consideration of the fairness of the proposed settlement to Granite State is relevant, this is distinguishable from the duty the Court has to monitor the priority of payment of a creditor's claim in a reorganization under the Bankruptcy Code. Granite State has been a participant in this case as an insurer for years and had ample opportunity to participate in the negotiations leading to the proposed settlement. Under Granite State's theory, it would likewise be unfair to the Port, Cadet, Century and Great American not to permit settlement. As long as the requirements of A & C Props. and Glover have been met, the Court is not prohibited from approving a settlement of contingent and future costs.

In addition, the court record contains sufficient information for this Court to make an informed decision regarding the Settlement Agreement. While it is true that the actual costs cannot be known until the DOE approves a final remedy, the ultimate settlement amount is not the result of pure speculation as alleged. Since the Court's May 16, 2005 decision, both

MEMORANDUM DECISION - 8

parties have obtained bids and proposals from four environmental consulting firms containing estimates of future remediation costs. These proposals range in cost from $20 million to $68 million, when the Port's pasts costs are factored in, and the remedies range from intense chemical treatment to very limited treatment. The highest and lowest bids were rejected, leaving two remaining bids that average between $23 million and $34 million. The parties relied on these proposals in agreeing upon a fair settlement amount of $24 million. Based on this evidence, the Court concludes that the settlement amount of $24 million falls within the range of reasonableness and is supported by the record, including expert witness declarations.

Even though sufficient facts are needed to properly evaluate a settlement, the Court is not required to hold a full evidentiary hearing or "mini-trial" before a compromise can be approved. In re Pac. Gas & Elec. Co., 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004). Otherwise there would be little motivation to compromise. Instead, a court's proper role is "'to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" Pac. Gas & Elec., 304 B.R. at 417 (quoting In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496 (Bankr. S.D. N.Y. 1991) (citations and internal quotation marks omitted)).

Similarly, in In re Schmitt, 215 B.R. 417 (9th Cir. BAP 1997), a party objecting to a settlement agreement argued that the lower court did not have sufficient information before it to approve a settlement. After quoting language from AWECO, 725 F.2d at 299, holding that it was an abuse of discretion to approve a compromise absent a sufficient factual foundation, the Bankruptcy Appellate Panel for the Ninth Circuit (BAP), stated, "[o]n the other hand, in determining whether to propose a compromise, a trustee need not burden the estate 'with

costs and expenses arising out of all manner of questions that may be presented for litigation.'" Schmitt, 215 B.R. at 425 (quoting In re Carla Leather, Inc., 44 B.R. 457, 472 (S.D. N.Y. 1984), aff'd, 50 B.R. 764 (S.D. N.Y. 1985)). The BAP affirmed the lower court's approval of the compromise. As in Schmitt, this Court has sufficient information before it to determine whether the settlement should be approved.

In this case, the Court conducted a special set hearing on the motion to approve the settlement at which lengthy arguments were presented. The hearing was continued once at Granite State's request, to provide it with additional time to prepare and respond. Overlength pleadings were filed by all parties, including numerous declarations and attachments, as well as a copy of the Settlement Agreement. The information provided and reviewed by the Court was sufficient to determine whether the Settlement Agreement was fair and equitable as required by Fed. R. Bankr. P. 9019 and reasonable as required by Washington state law. Although an evidentiary hearing was not held, it was not requested by any of the parties and is not a prerequisite for approval of a settlement. See In re Depoister, 36 F.3d 582, 586 (7th Cir. 1994).

### 2. Difficulties in Collection

This factor also weighs in favor of approval. Although the Port is solvent and Cadet is protected by insurance, not all of the insurers have conceded coverage and have instead asserted a variety of potential coverage defenses. Cadet was forced to file a suit against its insurers because of these disputes, and many of the coverage issues are still pending in U.S. District Court. Under the Settlement Agreement, two of the three excess carriers, Century and Great American, have agreed to waive such defenses. The Settlement Agreement reasonably accounts for these defenses in that the Port is accepting a claim substantially

MEMORANDUM DECISION - 10

discounted from what it argues is due. Once the Settlement Agreement is approved, the only potential coverage disputes that will remain will be with Granite State.

### 3. Complexity of the Litigation Involved

This third factor strongly weighs in favor of approval of the Settlement Agreement. The factual and legal issues that must be resolved in order to determine the value of the Port's claim for remediation costs already incurred, and then in allocating responsibility between multiple parties are extremely complex. The complexity of this litigation became obvious to the Court during the summary judgment hearing held March 30, 2005. It is undisputed that trial of this case would not only be time consuming for this Court and the parties involved, but also extremely expensive. The parties expect to call numerous expert witnesses with divergent views of liability and damages. It is estimated that the hearing on past damages will take at least two weeks, with a second hearing to be held on future damages at a later date.

The Settlement Agreement is beneficial to all parties in that it deals with not only past costs, but future costs as well. In its decision on the summary judgment motions, the Court ruled that it would not set the amount of future remediation costs at this time. Although an evidentiary hearing was set on past costs, the issue of future costs would have been pending for possibly years to come. The Settlement Agreement will resolve all claims as between the Port and Cadet and finally determine the last remaining issue in the bankruptcy case. The benefit to the parties in having all of these issues finally resolved is of considerable value.

### 4. The Paramount Interest of Creditors

The fourth factor also favors settlement. The only remaining creditors with Class 14 claims under Cadet's Plan are the Port and the DOE. The Port's interests are obviously served by the Settlement Agreement in that it provides a resolution to what has been lengthy

MEMORANDUM DECISION - 11

and costly litigation. The DOE, although not a party to the Settlement Agreement, has not objected to its approval. The DOE is benefited in that there is now only one party, the Port, who has accepted responsibility for the cleanup and any future remediation that will be necessary.

Based on an evaluation of the four factors set forth by the Ninth Circuit in A & C Properties, the Court concludes that the Settlement Agreement as proposed is fair and equitable.

### C. Evaluation of the Settlement Agreement under State Law

Although the Court is not convinced that evaluation of the Settlement Agreement under Washington state law is necessary for its approval, the Court has undertaken this analysis as requested and finds that the Settlement Agreement is also reasonable under Washington state law standards.

In summary, the Port's damages in this case are significant and Cadet has conceded liability under MTCA for a large portion of the contamination. Although Cadet believes that its defenses have merit, the ultimate settlement amount takes into account the fact that other parties besides Cadet are responsible for a percentage of the contamination. This also addresses the issue of the Port's own responsibility, through its tenant, ST Services. The risk and expenses of continued litigation strongly weigh in favor of approval. Ability to pay by either party, although relevant because of the coverage issues and possibility that future remedial costs for which Cadet is responsible could exceed its insurance coverage, is not a significant issue in this case.

Granite State appears to allege that the Settlement Agreement should not be approved based on evidence of bad faith, collusion, or fraud. Granite State's allegations are

MEMORANDUM DECISION - 12

unsubstantiated and the settling parties have refuted such allegations. The Settlement Agreement was the result of years of discovery and months of mediation with an experienced mediator in several separate sessions. Granite State failed to provide any explanation as to why it participated only sporadically in these sessions. Rather than conspiring, the evidence indicates that the parties constantly encouraged Granite State to participate in the settlement negotiations and accommodated Granite State's request for further sessions and continuances on several occasions. The Court finds no evidence of bad faith, collusion or fraud on the part of the settling parties.

An evaluation of the releasing party's investigation and preparation of the case also favors approval. Both parties have completed extensive discovery in this case and have actively prepared for the future evidentiary hearing on past costs. Both sides have employed numerous experts to investigate the potential claims and defenses and have submitted multiple expert reports. Cross-motions for summary judgment have been filed and a decision rendered.

The final factor, the interest of parties not being released, is probably the most relevant to Granite State. Granite State is the only remaining party that will not be released under the Settlement Agreement. The Court, however, does not find that this factor weighs against approval. Although approval will bind Granite State regarding the reasonableness of the settlement amount, Granite State will retain any defenses it has to contest coverage or coverage amounts and can continue to pursue such defenses in the pending coverage litigation before the U.S. District Court, and in the interlocutory appeal pending before the Ninth Circuit Court of Appeals. The other excess carriers, Century and Great American, agreed to forfeit such defenses in the Settlement Agreement. Such defenses have value, for

MEMORANDUM DECISION - 13

if successful, Granite State could pay substantially less than the estimated $14 million of the Port's claim.

### D. Granite State's Additional Objections

Granite State has also raised several other objections to the Settlement Agreement. The majority of these objections are not relevant to the standards this Court is directed to apply in evaluating whether settlements should be approved.

Granite State argues that the settlement amount is unreasonable because a portion of the Port's remedial action costs are not recoverable under MTCA. For instance, Granite State takes issue with the costs of the GWM air stripping towers and costs for opposing Clark County Utility District's water rights application. Although the Port has provided a credible explanation as to why such costs are recoverable, the Court would again reiterate that such objections are not determinative. A settlement is a compromise by the parties. In this case, the Port has submitted evidence supporting a claim for approximately $32 million, which consists of $13.5 million in incurred costs and $18.5 million in future costs. The parties have agreed to a claim of $20 million. This agreed to reduction by the Port of $12 million takes into account the risks of litigation and the strengths and weaknesses of each party's position. Two of the three excess insurance carriers are parties to the Settlement Agreement and are satisfied with the proposed settlement amounts. The Court is not required to examine each detailed cost that comprises the settlement. Rather, the Court examines the settlement as a whole, in light of the considerations set forth in A & C Properties, to determine whether it is fair and equitable. If these factors weigh in favor of approval, it is within the Court's discretion to approve the compromise.

MEMORANDUM DECISION - 14

Granite State also asserts that insufficient information has been provided regarding the sale/lease back of the Cadet real estate and improvements. This argument ignores the fact that this property is no longer property of the bankruptcy estate. Cadet's Plan was confirmed over six years ago and 11 U.S.C. § 363 generally does not apply to sales of non-estate property. Further, although an exact sales price has not been negotiated, the Settlement Agreement does provide a specific and reasonable process for arriving at the ultimate price. According to the terms of the Settlement Agreement, both the Port and Cadet will hire an appraiser, and fair market value will be determined through a formula comparing the two appraisals. If necessary, the two appraisers will agree upon a third independent appraiser to break the tie. Granite State has failed to show how this approach is unreasonable or even relevant to a determination as to whether the settlement in its entirety is not fair and equitable.

Finally, Granite State argues that the Settlement Agreement is unreasonable in that it allows the settling insurers to escape their obligation to pay a fair share of the settlement without providing Granite State any recourse against the settling insurers. Under the settlement, Century and Great American will pay $10 million dollars to the Port for the Cadet and Swan Sites. They have already paid $1.2 million for cleanup of the Cadet Site. Accordingly, their total indemnity payment is $11.2 million. Granite State, on the other hand, could be found responsible for $14 million. The percentage of responsibility for the settlement amount is approximately 58% Granite State and 42% Century/Great American. However, as stated above, approval of the Settlement Agreement does not mandate that Granite State will pay $14 million. Unlike Century and Great American who are forfeiting any rights to contest coverage, Granite State will retain these defenses. The Port bears the risk that Granite State will be successful. It is not unfair to allow the settling insurers a discount in

MEMORANDUM DECISION - 15

exchange for their agreement to settle and loss of any defenses. In addition, although a claims bar order is a condition of settlement, whether to grant such an order is a determination for the U.S. District Court. The Court does not agree that making the Settlement Agreement contingent upon such an order being entered renders it unreasonable.

The objections raised by Granite State often mirror the arguments made by both parties in support of their claims and defenses throughout these protracted proceedings. Although the settlement may not be the best case scenario for Granite State, it is not the best case scenario for any of the settling parties. This is the nature of settlement.

While a creditor's objection to a compromise must be afforded due deference, such objections are not controlling. A & C Props., 784 F.2d at 1382. "The law favors compromise and not litigation for its own sake, In re Blair, 538 F.2d at 851, and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed." A & C Props., 784 F.2d at 1381 (citing In re Blair, 538 F.2d 849 (9th Cir. 1976)). The Court has reviewed in detail both the federal and state law factors, all facts necessary to make an intelligent and independent judgment, given due consideration to the objections made, and determines that the Settlement Agreement is fair and equitable and is approved.

DATED: March 16, 2006

*Paul B. Snyder*
———————————————————
Paul B. Snyder
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 16